UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DION ANDREWS,<br>      Plaintiff, | :<br>:<br>: |
| v. | :   CASE NO. 3:17-cv-1233 (SRU) |
| GATES, et al.,<br>      Defendants. | :<br>:<br>: |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Dion Andrews commenced this civil rights action asserting claims for violation of his rights under the Eighth and Fourteenth Amendments and the Americans with Disabilities Act. In the Initial Review Order, filed on November 21, 2017, I dismissed the Americans with Disabilities Act claim and stated that the case would proceed on the Eighth Amendment claims for deliberate indifference to serious mental health needs and deliberate indifference to safety as well as the claim for supervisory liability. I also permitted the case to proceed on Andrews' Fourteenth Amendment due process claim relating to his classification as a Security Risk Group ("SRG") inmate and resulting confinement in SRG protective custody. ECF No. 10 at 11.

The named defendants, Commissioner Scott Semple, SRG Director John Aldi,[1] Warden Allison Black, Deputy Warden Denise Walker, Lieutenant Papoosha, Correctional Officer John Doe,[2] and Counselor Ferreira have moved for summary judgment. Andrews' opposition was due

---

[1] Andrews incorrectly identifies this defendant as John Aldy. I will use the correct spelling of defendant Aldi's name.

[2] On August 29, 2018, Andrews identified Officer Doe as Hector Figueroa. ECF No. 37. Service has not been effected on Officer Figueroa.

on or before April 23, 2019. Although Andrews was advised of the time within which he should respond to the motion for summary judgment and the contents of a proper response, Notice to Pro Se Litigant, ECF No. 50-3, he has filed neither opposition papers nor a motion for extension of time within which to do so. For the reasons that follow, the defendants' motion is granted with respect to all defendants except Officer Hector Figueroa.

I.   Standard of Review

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a), Fed. R. Civ. P.; *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 113-14 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113-14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Which facts are material is determined by the substantive law. *Anderson*, 477 U.S. at 248. "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense …." *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). He cannot "'rely on conclusory allegations or unsubstantiated speculation' but 'must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact.'" *Robinson v.*

2

*Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). To defeat a motion for summary judgment, the nonmoving party must present evidence that would allow a jury to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

Although the court is required to read a self-represented "party's papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

II. <u>Facts</u>[3]

In March 2017, Andrews was confined at BCC Correctional Center ("BCC"). Lieutenant Papoosha was the intelligence administrative lieutenant for BCC and the unit manager for unit 38B. ECF No. 50-2, ¶ 2. Unit 38B was a specialized unit that housed inmates who were members of an SRG and were also on protective custody status. *Id.*, ¶ 3. Protective custody status signifies that an inmate must be kept separated because he has been threatened by other inmates. *Id.*, ¶ 4.

Unit 38B is the only housing unit within the Department of Correction designated to

---

[3] The facts are taken from the defendants' Local Rule 56(a)1 Statement and attached exhibits. Local Rule 56(a)2 requires the party opposing summary judgment to submit a Local Rule 56(a)2 Statement that contains separately numbered paragraphs corresponding to the Local Rule 56(a)1 Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party. Each admission or denial must include a citation to an affidavit or other admissible evidence. In addition, the opposing party must submit a list of disputed factual issues. D. Conn. L. Civ. R. 56(a)2 and 56(a)3. Although the defendants informed Andrews of this requirement, ECF No. 50-3, Andrews has not submitted any opposition papers. Accordingly, the defendants' facts are deemed admitted. *See* D. Conn. L. Civ. R. 56(a)1 ("All material facts set forth in said statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Rule 56(a)2."). Because the Complaint is verified, I may consider its allegations in reviewing the motion for summary judgment.

house SRG inmates on protective custody status. *Id.*, ¶ 5. Those inmates are referred to as on "dual status." *Id.*, ¶ 6. Unit 38B consists of two tiers with twelve cells on each tier. One tier, referred to as "5-corridor," houses protective custody inmates. The other tier, referred to as "6-corridor," houses dual-status inmates. *Id.*, ¶ 7.

Andrews and Rivera were both members of the SRG Bloods and both were on protective custody status. Thus, they both were housed in Unit 38B, 6-corridor. *Id.*, ¶ 8. Andrews stated in his deposition that he considered Rivera his closest friend in prison and has spoken to him multiple times on the phone since Rivera discharged from custody. *Id.*, ¶¶ 9-10.

Andrews and Rivera had a separation profile as a result of a January 2017 incident and were on "keep separate" status in March 2017. *Id.*, ¶ 11. The January incident involved Andrews pushing and punching Rivera when Rivera knocked chess pieces over, refused to pick them up, and threw food at Andrews. *Id.*, ¶ 12. The separation profile is determined by Population Management while the "keep separate" status is determined in-house. The result of the separation profile and "keep separate" status is that Andrews and Rivera must be kept separated and cannot be out of their cells in the housing unit at the same time. *Id.*, ¶ 11.

Andrews stated at his deposition that he and Rivera had gotten into fights over the years but always "patched it up" and remained friends. *Id.*, ¶ 13. Andrews said that they remained "mad at each other a little bit" after the January 2017 incident but had patched things up and were still friends. *Id.*, ¶ 14.

Although Andrews and Rivera had a separation profile and "keep separate" status, they continued to be housed in Unit 38B because there was no other housing unit within the Department of Correction authorized to house them. *Id.*, ¶ 15. Lieutenant Papoosha designed a

plan to prevent inmates like Andrews and Rivera from being out of their cells at the same time. *Id.*, ¶ 16. The dual status tier was divided into two groups. Cells 1-6 were in Group 1, and cells 7-12 were in Group 2. Inmates from only one of the groups were permitted out of their cells at any time. *Id.*, ¶ 17. Andrews stated in his deposition that he did not physically interact with Rivera from the January 2017 incident until the March 6, 2017 incident underlying this action. *Id.*, ¶ 18. During that time, however, they had friendly conversations from cell-to-cell and Rivera never threatened Andrews. *Id.*, ¶ 19.

On March 6, 2017, Andrews was in Group 2 and Rivera was in Group 1. Rivera was on confined-to-quarters status because of a recent disciplinary report. He was only allowed out of his cell by himself and could not leave his cell even with other inmates in his group. *Id.*, ¶ 20. Lieutenant Papoosha posted recreation schedules, "keep separate" information, and other relevant information regarding the inmates in the Unit 38B control bubble. On March 6, 2017, the "keep separate" information for Andrews and Rivera was posted in the control bubble. *Id.*, ¶ 21.

On March 6, 2017, staff observed Rivera assaulting Andrews in the shower area. *Id.*, ¶ 22. A code was called. Lieutenant Papoosha responded to the code. *Id.*, ¶ 23. Although Andrews and Rivera were not supposed to be out of their cells at the same time, the control bubble officer, John Doe, had permitted both inmates to be out of their cells at the same time. *Id.*, ¶ 24. Rivera was out of his cell taking a shower during his confined-to-quarters recreation time. He asked Officer Doe for an additional ten minutes in the shower and the officer agreed. While Rivera was finishing his shower, Officer Doe released Group 2 for their unit recreation time. Andrews was in Group 2. *Id.*, ¶ 25.

Officer Doe should not have released Group 2 until he secured Rivera in his cell. *Id.*, ¶ 26. The incident occurred during the first shift. Lieutenant Papoosha recalls that Officer Doe normally worked the third shift and was fairly new to BCC. Because third shift officers do not supervise recreation, Officer Doe would not have been as familiar with the inmates in the unit as the first shift officers were. *Id.*, ¶ 28. Officer Doe acknowledges his error in the incident report. *Id.*, ¶ 29.

In March 2017, Counselor Ferreira was working as a counselor in Unit 38B. Her duties included responding to inmate request forms and arranging legal calls. *Id.*, ¶ 31. Because she was not a custody officer, she was not responsible for inmate movement in and out of the cells. *Id.*, ¶ 32. The block officer is responsible for releasing inmates from their cells and requiring them to return to their cells. *Id.*, ¶ 33.

Counselor Ferreira had just finished touring the unit. *Id.*, ¶ 4. When the incident occurred, Counselor Ferreira was in the unit, standing just outside the control bubble. After observing the assault, Counselor Ferreira realized that Rivera had not been in his cell when she toured the unit. She did not know that he was still in the unit because female officers do not inspect the showers when they tour a housing unit. She did not know that Andrews and Rivera were out of their cells in the unit at the same time. *Id.*, ¶ 35. Rivera could have been outside of the unit. For example, he could have been in the medical unit, the lieutenant's officer, or on a legal visit. *Id.*, ¶ 36. Counselor Ferreira recalls the code being called but, as a counselor, she did not respond to the code. *Id.*, ¶ 37.

On June 23, 2017, Andrews was transferred from BCC to Northern Correctional Institution ("Northern"). Andrews was assigned to the Administrative Segregation Program

("AS") at Northern because he violently assaulted another inmate in the dual status unit at BCC. *Id.*, ¶ 38.

Warden Black was the warden at BCC from February 2014 through April 1, 2017. She currently is the warden at Hartford Correctional Center ("Hartford"). *Id.*, ¶ 39. When Andrews completed AS, he was transferred to MacDougall-Walker Correctional Institution, and then to Hartford. Warden Black agreed to accept Andrews as a temporary transfer because she was familiar with him from her time at BCC. *Id.*, ¶ 40. Andrews was housed at Hartford instead of BCC because Rivera was still at BCC and correctional officials were concerned about housing them in the same unit after the prior incidents. *Id.*, ¶ 41.

In October 2018, Andrews was housed in the Special Needs Unit at Hartford.[4] The Special Needs Unit is a restrictive status unit for inmates who have demonstrated behavior that poses a threat to safety and security. *Id.*, ¶ 42. Andrews was not on special needs status. Warden Black agreed to house Andrews at Hartford to accommodate the needs of the warden at BCC. *Id.*, ¶ 43.

Andrews filed one grievance relating to the March 6, 2017 incident. *Id.*, ¶ 46. He described the March 6, 2017 incident and asked to be removed from SRG and SRG protective custody and to be returned to general population. Defs.' Mem. Ex. 6, ECF 50-9, at 3. When he was interviewed in connection with the grievance, Andrews indicated that he felt safe with the inmates he recreated with. He only felt threatened by Rivera. *Id.* at 4.

III. Discussion

---

[4] On November 7, 2018, Andrews filed a notice of change of address indicating that he had been transferred to BCC. ECF No. 45. On December 27, 2018, he filed a second notice of change of address indicating he had been transferred to Garner Correctional Institution where he currently is incarcerated. ECF No. 46.

The defendants move for summary judgment on three grounds: (1) Andrews' deliberate indifference claims are without merit, (2) Andrews has not exhausted his administrative remedies, and (3) the defendants are protected by qualified immunity.

A. <u>Exhaustion of Administrative Remedies</u>

The defendants contend that Andrews failed to properly exhaust his administrative remedies regarding his claims for deliberate indifference to mental health needs and denial of due process.

The Prison Litigation Reform Act requires prisoners to exhaust administrative remedies before filing a federal lawsuit relating to prison conditions. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The exhaustion requirement applies to all claims regarding "prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002).

Exhaustion of all available administrative remedies must occur regardless of whether the administrative procedures provide the relief that the inmate seeks. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). Furthermore, prisoners must comply with all procedural rules regarding the grievance process prior to commencing an action in federal court. *See Woodford v. Ngo*, 548 U.S. 81, 90-91, 93 (2006) (proper exhaustion "means using all steps that the agency holds out ... (so that the agency addresses the issues on the merits) ... [and] demands compliance with agency deadlines and other critical procedural rules"). Special circumstances will not relieve an inmate of his or her obligation to adhere to the exhaustion requirement. An inmate's failure to exhaust

8

administrative remedies is only excusable if the remedies are in fact unavailable. *See Ross v. Blake*, ___ U.S. ___, 136 S. Ct. 1850, 1858 (2016).

The administrative remedies for the State of Connecticut Department of Correction are set forth in Administrative Directive 9.6, entitled Inmate Administrative Remedies (effective August 15, 2013) and may be found at: http://www.portal.ct.gov/doc. The type of remedy available to an inmate depends on the nature of the issue or condition experienced by the inmate or the decision made by correctional personnel. For all matters relating to any aspect of a prisoner's confinement that are subject to the Commissioner's authority and that are not specifically identified in Sections 4(B) through 4(I) of Administrative Directive 9.6, the applicable remedy is the Inmate Grievance Procedure. The exceptions listed in the directive all deal with appeals of decisions for which there are other administrative remedy procedures in place.

Under Administrative Directive 9.6(6), an inmate must first attempt to resolve the matter informally. He or she may attempt to verbally resolve the issue with an appropriate staff member or supervisor. *See id.* at 9.6(6)(A). If attempts to resolve the matter orally are not effective, the inmate must make a written attempt using a specific form and send that form to the appropriate staff member. *See id.* If all attempts to resolve the matter informally are unsuccessful, an inmate may file a Level 1 grievance. *See id.* at 9.6(6)(C).

The Level 1 grievance must be filed within thirty calendar days from the date of the occurrence or discovery of the cause of the grievance and should include a copy of the response to the written request to resolve the matter informally or explain why the response is not

attached. *See id.* The Unit Administrator shall respond in writing to the Level 1 grievance within thirty business days of his or her receipt of the grievance. *See id.* at 9.6(6)(I).

The inmate may appeal the disposition of the grievance by the Unit Administrator or the Unit Administrator's failure to dispose of the grievance in a timely manner to Level 2. *See id.* at 9.6(6)(G) & (I). The Level 2 appeal must be filed within five calendar days from the inmate's receipt of the decision on the Level 1 grievance. *See id.* at 9.6(K).

Level 2 appeals of inmates confined in Connecticut correctional facilities are reviewed by the appropriate District Administrator. *See id.* at 9.6(6)(K). The District Administrator should respond to the Level 2 appeal within thirty business days of receipt of the appeal. *See id.*

Level 3 appeals are restricted to challenges to department policy, the integrity of the grievance procedure or level 2 appeals to which there has been an untimely response by the District Administrator. *See id.* at 9.6(6)(L). A Level 3 appeal must be filed within five calendar days from the inmate's receipt of the decision on the Level 2 appeal. *See id.* A Level 3 appeal is reviewed by the Commissioner of Correction or his or her designee. *See id.*

Andrews filed only one grievance relating to the March 6, 2017 incident. In the section of the grievance form asking the inmate to state the problem and requested resolution, Andrews states that he was assaulted by an inmate with whom he had a separation order and asked to be removed from the SRG program and SRG protective custody. Defs.' Mem. Ex. 6, ECF No. 50-9, at 3. The grievance was denied. The reviewer determined that Andrews filed a grievance regarding his safety and denied the grievance because Andrews had conceded that, in his current housing assignment, he no longer felt his safety was at risk. *Id.*

Andrews appealed the grievance. He stated that, although he did not fear other inmates, he did fear Rivera. He disputed the resolution as not addressing the actions of Officer Doe. *Id.*, Ex. 7, ECF No. 50-10 at 2. The appeal was denied. The reviewer noted that an inquiry had been conducted into Andrews' claim of staff misconduct. The inquiry showed "that the Officer erred by mistakenly allowing a group of inmates out prior to locking up the inmate that assaulted you. Although the officer in question did make an error there is nothing to substantiate that this decision was one of deliberate indifference." *Id.*

In the grievance, Andrews challenges the actions of Officer Doe in permitting Rivera and him to be out of their cells in the unit at the same time in violation of the separation profile and "keep separate" order. He makes no reference to his claims for deliberate indifference to mental health needs and denial of due process relating to his assignment to SRG protective custody. Because this grievance did not alert correctional officials about separate claims for deliberate indifference to mental health needs and denial of due process, it cannot serve to exhaust Andrews' administrative remedies on those claims. *See Woodford*, 548 U.S. at 90 (proper exhaustion enables agency to review issues on the merits); *accord Moreau v. Peterson*, 672 F. App'x 119, 120 (2d Cir. 2017) (affirming dismissal of unexhausted claims where inmate exhausted some, but not all, claims set forth in liberal reading of complaint). The defendants' motion for summary judgment is granted with respect to the claims for deliberate indifference to mental health needs and denial of due process on the ground that Andrews failed to exhaust his administrative remedies on those claims before commencing this action.

B.  Deliberate Indifference to Safety

The defendants argue that Andrews cannot state a cognizable claim for deliberate

11

indifference to his safety. To state a claim for deliberate indifference to safety or failure to protect from harm, Andrews must show that the alleged conduct was sufficiently serious and that the defendants acted with a sufficiently culpable state of mind, that is, they acted maliciously and sadistically to cause the plaintiff harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The defendants must have been aware of, and deliberately disregarded, an excessive risk to Andrews' health or safety. *Bridgewater v. Taylor*, 698 F. Supp. 2d 351, 357 (S.D.N.Y. 2010) (explaining that defendants must be aware of facts supporting an inference that harm would occur and must actually draw that inference). When evaluating a claim for deliberate indifference to safety, the court considers "the facts and circumstances of which the official was aware at the time he acted or failed to act." *Hartry v. County of Suffolk*, 755 F. Supp. 2d 422, 436 (E.D.N.Y. 2010) (internal quotation marks and citation omitted).

Rivera was permitted out of his cell at the same time as Andrews despite the separation profile and "keep separate" order. That action afforded Rivera the opportunity to assault Andrews. This conduct constitutes an excessive risk to Andrews' health and safety and satisfies the objective component of the deliberate indifference standard.

Andrews stated in his deposition that only defendants Doe and Ferreira were personally involved in the incident. Andrews Dep., Defs.' Mem. Ex. 8 at 38, ECF No. 50-11 at 12. Officer Doe opened Andrews' cell door when Rivera was out of his cell in the unit. Andrews contends that Counselor Ferreira was aware that the two inmates had fought in January 2017 and that Rivera was not in his cell immediately before Andrews' cell was opened. *Id.* at 38-39.

Counselor Ferreira has filed her affidavit stating that, although she noticed that Rivera was not in his cell, she, as a female officer, does not inspect the showers when touring the unit.

12

Thus, she did not know that Rivera was out of his cell in the unit. It was equally likely that Rivera was out of the unit. Ferreira Aff., Defs.' Mem. Ex. 3, ECF No. 50-6, ¶¶ 11-12. Andrews has presented no evidence showing that Counselor Ferreira was aware of and disregarded any danger to Andrews. Absent such evidence, Andrews fails to state a cognizable deliberate indifference claim against Counselor Ferreira.

Officer Doe was fairly new to BCC and normally worked on the third shift. Officers on the third shift do not organize recreation and are not as familiar with the inmates in the housing units as first shift officers. Papoosha Aff., Defs.' Mem. Ex. 1, ECF No. 50-4, ¶ 17. However, Lieutenant Papoosha states that the list of "keep separate" inmates was in the control bubble, where Officer Doe was stationed. *Id.*, ¶ 10. Officer Doe granted Rivera an additional ten minutes in the shower and released the other group for recreation before that time elapsed. Officer Doe conceded in his statement in the incident report that he should have waited until inmate Rivers was locked in his cell before releasing the next group for recreation. *Id.*, Attachment 2, ECF 50-4 at 10. The investigation in response to Andrews' grievance appeal, indicated that Officer Doe made a mistake. Defs.' Mem. Ex. 7, ECF No. 50-10 at 2.

The defendants argue that, because Andrews alleged that he and Rivera were friends, there was no notice of an excessive risk to Andrews' safety if both inmates were in the unit at the same time. That argument ignores the "keep separate" order posted in the control bubble, the separation profile, and the fact that the inmates were in different groups that were never permitted out of their cells at the same time. The defendants have submitted no evidence about Officer Doe's subjective knowledge. Without evidence of Officer Doe's knowledge of the need to keep the two inmates separated, Lieutenant Papoosha's belief that the action was a mistake,

13

*i.e.*, negligence, is merely a conclusion, not a fact supporting summary judgment. *See, e.g., Wahad v. F.B.I.*, 179 F.R.D. 429, 435 (S.D.N.Y. 1998) (affidavits must contain specific facts based on personal knowledge); *Monroe v. Board of Educ. of Town of Wolcott*, 65 F.R.D. 641, 650 (D. Conn. 1975) ("conclusory statements of opinion in affidavits are entitled to no weight in court's deliberative process"). The defendants have presented no evidence to show whether Officer Doe's actions were deliberately indifferent, i.e., subjectively reckless, or merely negligent. *Farmer v. Brennan*, 511 U.S. 825, 839 (1994) (identifying the test for deliberate indifference under the Eighth Amendment as "subjective recklessness as used in the criminal law"). For example, if Officer Doe was aware of the "keep separate" list or that Rivera and Andrews were in separate groups and still permitted them to be out of their cells in the unit at the same time, he could be deliberately indifferent to Andrews' safety. Because the defendants have presented no evidence regarding Officer Doe's understanding, they have not shown that they are entitled to judgment as a matter of law. The motion for summary judgment is denied with respect to the claim against Officer Doe.

    C, <u>Supervisory Liability</u>

In his deposition, Andrews stated that he has named all other defendants as supervisory officials. Defs.' Mem. Ex. 8 at 38-40, ECF No. 50-11 at 12.

> To state a claim for supervisory liability, a plaintiff must establish that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the constitutional violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which the unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference … by failing to act on information indicating that unconstitutional acts were occurring.

14

*Shaw v. Prindle*, 661 F. App'x 16, 18 (2d Cir. 2016) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

The defendants have submitted affidavits from Lieutenant Papoosha, Warden Black, John Aldi, and Deputy Warden Walker. Lieutenant Papoosha explained the BCC has the only SRG protective custody unit within the Department of Correction. Because all SRG protective custody inmates must be housed there, he created two groups of inmates so inmates assigned to SRG protective custody and who had separation profiles could be kept apart from each other. This procedure worked to keep Andrews and Rivera separated from January to March 2017. Defendants Black and Aldi were aware of and approved this procedure. Andrews conceded in his deposition that the procedure was effective in keeping him apart from Rivera. Andrews Dep. at 16-17. Thus, Andrews' challenge is not to the procedures created to keep apart SRG protective custody inmates with separation profiles but to the failure to follow those procedures.

Andrews concedes that the supervisory defendants were not present during the assault nor were responsible for the failure to follow established procedures. Although he notified each of them after the assault, notice after the fact of an isolated incident is insufficient to establish supervisory liability. "After the fact notice of a violation of an inmate's rights is insufficient to establish a supervisor's liability for the violation. Receiving post hoc notice does not constitute personal involvement in the unconstitutional activity and cannot be said to have proximately caused the damage suffered by the inmate." *Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009). If the constitutional violation were ongoing, on the other hand, such notice would be sufficient under the second *Colon* factor. *See Phillip v. Shriro*, 2014 WL 4184816, at *5 (S.D.N.Y. Aug. 22, 2014). Because this was an isolated incident, the supervisory defendants

15

had no opportunity to intervene to prevent the violation. The motion for summary judgment is granted with respect to defendants Semple, Aldi, Black, Walker, and Papoosha.[5]

IV.     Conclusion

The defendants' motion for summary judgment [**ECF No. 50**] is **GRANTED** with respect to the claims for deliberate indifference to mental health needs and denial of due process and with respect to all claims against defendants Semple, Black, Walker, Aldi, Papoosha, and Ferreira**.** The case will proceed on the claim for deliberate indifference to safety against defendant Doe, whom Andrews has identified as Officer Hector Figueroa.

It is hereby ordered that:

(1)     **The Clerk shall** contact the Department of Correction Office of Legal Affairs to ascertain the service or current work address for defendant Figueroa, mail a waiver of service of process request packet containing the Complaint to him at the address provided within **twenty-one (21) days** of this Order, and report to the court on the status of the waiver request on the thirty-fifth day after mailing. If the defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service on him in his individual capacity and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(2)     **The Clerk shall** prepare a summons form and send an official capacity service packet to the U.S. Marshal Service. The U.S. Marshal is directed to effect service of the

---

[5] The defendants also argue that they are protected by qualified immunity. However, they address their argument only to the supervisory defendants and Counselor Ferreira. Because I have granted the defendants' motion regarding the claims against all of those defendants, I will not address the qualified immunity argument.

Complaint on defendant Figueroa in his official capacity at the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141, within **twenty-one (21) days** from the date of this order and to file a return of service within thirty (30) days from the date of this order.

(3) Defendant Figueroa shall file an answer within **sixty (60) days** from the date the waiver form is sent.

(4) Any additional discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within **four months (120 days)** from the date of this order. Discovery requests need not be filed with the court.

(5) Any motion for summary judgment shall be filed within **five months (150 days)** from the date of this order.

(6) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

**SO ORDERED** this 8th day of July 2019 at Bridgeport, Connecticut.

/s/ STEFAN R.UNDERHILL
Stefan R. Underhill
United States District Judge